Good morning. Welcome. We're proceeding to argument in the case United States v. Lischewski, and you may proceed. Thank you, Your Honor. May it please the Court, my name is John Klein, and I represent Chris Lischewski, who is the appellant in this matter. Thanks for correcting my pronunciation. I was afraid of that. I've mispronounced it myself many times, and I'd like to reserve five minutes for rebuttal if I could. This case, as the Court surely knows, involves a price-fixing conspiracy under the Sherman Act. A Sherman Act price-fixing conspiracy has no overt act. All the government needs to prove is an agreement to fix prices, in particular that the defendant participated in an agreement to fix prices. And that agreement can last seconds. It doesn't have to be expressed or in writing. It can produce no action. It can be found to exist even if no one abides by it. And on top of that, in a case like this, a per se violation case, under current law, the government does not have to prove an anti-competitive intent. It doesn't have to prove any anti-competitive effect. It doesn't even have to prove that the agreed restraint on trade was unreasonable, which is an element of the offense. That's under current law. Of course, we've challenged that, but the panel is bound by previous decisions of the Court. So, against this backdrop, where so little stands between conviction and acquittal, it is extraordinarily important to instruct precisely and accurately on the agreement element, because that is all there is in this case. And it is particularly important in the context of this case, because this was a very close case. You wouldn't know it from the time the jury spent deliberating, and I think that's attributable to the instructional errors that we'll get to. But the government had, on its side, cooperators who had made deals and came in and testified that Mr. Lyshevsky told them to fix prices. But on the other side of the case, in addition to Mr. Lyshevsky's own testimony, there was economic data which showed that the pricing structure essentially was the same before, during, and after this alleged conspiracy. You had fish costs skyrocketing and evidence, again from an expert economist, that fish costs and prices were closely correlated. And you had, I think, almost most powerfully, reams of documents, contemporaneous documents, the documents that Bumblebee was generating at the time, showing intense competition, decrying intense competition. The cooperators themselves wrote a number of these documents where they lament the fierce competition that they're facing from Starkist. Mr. Klein, I mean, you've raised a number of different instructional errors. Which of these do you think is the most significant? Well, the one that, first of all, your honor, they have to be viewed collectively and they have to be viewed in the context of this case where the agreement element is so important. Of the various errors, the one that I would say troubles me the most is the mutual understanding instruction. Again, let me emphasize, the only thing standing between Mr. Leshefsky and prison was the agreement element. And yet, when it came time to instruct on that element, the district judge, who relied extensively on the ABA model instructions rather than on this court's pattern instructions, repeatedly instructed the jury that an agreement or mutual understanding would suffice. There's a basic problem with that, which is this. Every agreement is a mutual understanding, but not every mutual understanding is an agreement. And in the context of this case, that difference is critical because there was, for example, there was evidence at trial that there was a mutual understanding in the industry, the tuna industry, that because fish costs were skyrocketing, prices had to go up. That was a mutual understanding that was commonly shared and that is not the same as an agreement to fix prices. The government says, well, you know, you're looking at the word mutual or the phrase mutual understanding in isolation. And if you look at the instruction as a whole, they say it's clear that it was talking about an agreement. So how do you address that? Well, I don't think it was clear at all. And I think that's true for a couple of different reasons. First of all, the government suggests that agreement or mutual understanding is a unitary phrase like aid and a bet or covenant and agree. And it's not it doesn't have that sort of settled legal notion. On top of that, the conjunction here is not and, it's or. And or suggests to anyone, to lawyers, to jurors, to anyone who's reading the phrase that those two words or phrases mean something different. Agreement means one thing, mutual understanding means something else. That's the significance of or. So if you read the rest of the sentence, it says mutual agreement or mutual understanding between two or more competitors to fix, control, raise, lower, maintain or stabilize the prices charged. So when you add that clause to mutual understanding, then it becomes more of the agreement meaning. Maybe, Your Honor. But here's the problem. Take the example that I gave earlier. There's a mutual understanding in the industry that with fish costs going up, prices have to go up as well. Otherwise, the industry is just going to go out of business. That mutual understanding followed by a mutual raising of prices fits within that language. And yet, that's not a price fixing agreement. That happens all the time. I give an example in the brief to gas station owners on opposite corners. Oil prices are going up. They chat and lament the state of the industry. They come to a mutual understanding that in light of increasing oil prices, gas prices have to go up. They raise their prices. Maybe they raise them the same amount. That's different than a price fixing agreement, which requires an affirmative meeting of the minds. Why wouldn't that violate the Sherman Act if oil prices go up and the competitors all agree to raise their prices together? Isn't that quintessential Sherman Act violations? Because they don't agree. And let me make a distinction here, Your Honor, that I think is very important. The scenario that I just described as an evidentiary matter would permit a jury to find a price fixing agreement. But in terms of an instructional matter, that could be seen as something short of an agreement. If I'm a gas station owner and I chat with my competitor on the other corner and we're lamenting the price of oil and we say, gosh, prices are going to have to go up or we're out of business, and then we later raise our prices, that's a mutual understanding. But that is not an agreement. A jury could infer an agreement from those facts, but it could also not be an agreement. It could be a mutual understanding. That's a critical point. And by permitting the alternatives, agreement or mutual understanding in the context of this case, that was prejudicial. That made a difference in this case. It seems to me that the error of the instruction might have been to stabilize the prices, because a mutual agreement to fix prices seems pretty like price fixing. But a mutual agreement to stabilize the prices might be more in line with what you're talking about. It could be, or even to raise prices, a mutual understanding that prices, you know, rather than put it in the terms of the instruction, a mutual understanding that prices have to go up or we're out of business. That could be something other than an agreement to fix prices. I think that's the point. Let me turn quickly to the other instructions. There was an individual liability instruction given. Now, this instruction, again, was taken from these ABA model instructions, which were not prepared by judges. They were prepared by practitioners. They have no counterpart in the instructions from this court. And as the trial counsel objected, they were, this particular instruction was unnecessary. It was confusing. And what it amounted to is a kind of weird, incomplete aiding and abetting or willfully causing instruction. It didn't catch all the elements of aiding and abetting. And the government on appeal has disclaimed any reliance on aiding and abetting. But it talks about directly participating in the conspiracy. And that actually is the only statutory basis on which Mr. Lyshevsky can be found guilty other than aiding and abetting or willfully causing. But then it also, it goes on to talk about indirectly or directly authorizing, ordering, or helping a subordinate perpetrate the crime. So take some of that language. You indirectly help a subordinate perpetrate the crime. That suggests that you don't have to directly participate in the conspiracy yourself, but you can be found guilty for indirectly helping a subordinate perpetrate the crime. That smacks of aiding and abetting or perhaps willfully causing. And if it's aiding and abetting, and this court has held that aiding and abetting a conspiracy is a recognizable theory of criminal liability, you've got to comply with 18 U.S.C. 2A. If it's willfully causing, 18 U.S.C. Section 2B, well then you have to comply with that section. What about our decision in Brown? How do you grapple with that one? In two ways, Your Honor. First of all, if you look at the actual instruction given in Brown, the last sentence of that instruction, it's in footnote four of Brown, requires actual participation in the agreement. I've got it here. I just pulled it up on my screen. The final sentence of that instruction was a company official who knowingly participates in the conspiracy in this manner, that is by ordering or authorizing a subordinate to participate, is liable to the same extent as any other member of the conspiracy. I'm not crazy about Brown, but it at least required participation in the conspiracy by the defendant himself. The second point I would make about Brown, Your Honor, is that as far as I can tell, I don't have access to the briefs, but as far as I can tell from the opinion, that there was no objection along the lines or no argument along the lines of what we've made here, which is the court did not satisfy the aiding and abetting requirement. And it, in effect, created a non-statutory common law theory of criminal liability. I don't see that argument in Brown, and I don't know whether it was made in the brief, but it certainly didn't make it into the opinion. So that's how I deal with Brown on that point. Another instruction that is, I think, troubling and really unfair here is the per se instruction. Now, the court ruled, the district court ruled, pre-trial in accordance with law, which were challenging, but which this panel can't overrule, that this was a per se case. There would be no evidence admitted by Mr. Leszewski that this alleged agreement didn't cause any harm or have any anti-competitive effect, that it didn't have any effect on price. Mr. Leszewski was prepared to make that argument. He made a proffer, but the district court excluded it as current law requires. So with that evidence out, there was no need to have a per se instruction at all. There was no need to mention the issue to the jury. The jury doesn't know anything about antitrust law. It doesn't know that it prohibits only unreasonable restraints on trade. The issue could have just been left silent unless Mr. Leszewski's trial counsel had been foolish enough to make some contrary argument that required a corrective instruction. But the court went ahead and gave an instruction on the per se offense and basically said that there was no need for the jury to find that it was unreasonable that that issue had been resolved. Is this instruction out of an ABA model instruction too? Where did this one come from? Yes, it was. I think every instruction we're complaining about here came out of the ABA model instructions. But you're not saying that this instruction is incorrect as a matter of law, correct? You're just saying it was unnecessary. It was unnecessary, and it was prejudicial in a way that I'll try to succinctly describe and then leave myself a little time for rebuttal. It was prejudicial because it didn't just say that this is a per se offense. You don't need to worry about whether this was an unreasonable restraint on trade. It went on to say that the Sherman Act, quote, makes unlawful certain agreements that because of their harmful effect on competition and lack of any redeeming virtue are unreasonable restraints on trade. It is just unfair to tell the defendant you can't prove lack of harm. I'm going to preclude you from presenting any evidence on lack of harm, and then I'm going to instruct the jury that this agreement was harmful and lacks any redeeming virtue. So that's bad enough. But then the government gets up in closing. There's been no evidence of any harm to consumers, no evidence of any effect on price except a certain amount of evidence that Mr. Lischewski presented through his expert that the judge permitted. The government gets up in closing and based solely on this instruction, as far as I can tell, because there wasn't any evidentiary support for it, argues that Mr. Lischewski stole a few cents at a time from consumers, that price-fixing agreements disrupt our economy and prevent markets from operating the way they're supposed to. That these agreements cheat consumers of the benefits of free competition and that when companies decide they want to get together and stop competing the economy and consumers across the country, they all suffer. Are you saying these comments were themselves improper or they're improper in combination with the per se instruction? They may well have been improper on their own, but what they really do is highlight the prejudice from the per se instruction, because if they're improper, they'd be improper because they lack an evidentiary basis. But the government would say, and I think does say in its brief, well, we had a basis for this instruction. It was the judge's per se instruction. And if that view is credited, then it is the per se instruction that is improper. And the argument simply highlights the prejudice that the per se instruction caused. I think, Your Honor, if it's okay, I will stop here and leave myself three minutes for rebuttal. Certainly. Thank you. We'll hear from the United States. Thank you, Your Honor, and may it please the court. Can you hear me okay? We can. Thank you. Thank you. Brian Leach for the United States. Mr. Liszewski orchestrated and carried out a three-year conspiracy to suppress and limit price competition on canned tuna with his direct competitors at Starkist and Chitinabesit. On appeal, he asserts that Judge Chen committed a litany of errors and abuses of discretion throughout the five-week jury trial. But the law and the facts simply do not support his claims. Now, there's a good deal of discussion about the mutual understanding language in the conspiracy instruction. And it's important in this case to read the language of the jury instruction in its entirety on conspiracy. And what it begins with is explaining that conspiracy is a partnership in crime. And then it goes on to explain that to create such a relationship, such a criminal relationship, two or more persons must enter into an agreement or mutual understanding to act together for unlawful purposes or to achieve some lawful purpose by unlawful means. The very next sentence says, it is the agreement to act together that constitutes the crime. Now, Liszewski points to a number of examples where there may have been parallel conduct going on. But this instruction, by its plain terms, expressly excludes that type of parallel independent conduct. It says the mere similarity of conduct is not enough to prove conspiracy. It also goes on to explain having common aims and interests is also not enough to prove conspiracy. Can we go to the per se instruction that Mr. Klein was talking about at the end? I mean, I take his point to be sort of essentially this was over the top and unnecessary. Can you address that? Yes, Your Honor. The per se instruction was providing the jury important legal context and background. As Mr. Klein noted, the jury does not know antitrust law. They needed to be instructed as to the basis for why the per se rule exists in the first place. And that's what this instruction did. It went on to explain that harm is not an element of liability. It expressly excludes the concept of harm from the elements of liability. And it contemplates that the conspiracy may not have caused any harm. What it says is, if you find the elements of the charge of defense, you need not be concerned with the harm, if any, done by it. It explains that price fixing is illegal without consideration of the precise harm. Now, what the government was arguing in closing was it was explaining to the jury the seriousness of the offense, which is perfectly permissible under this court's decisions. It was explained to the jury, as the language of the quote says, why price fixing is a felony crime. Why was the instruction necessary if Judge Chen excluded any evidence that there was no harm to the conspiracy? Your Honor, it was important to explain to the jury why per se offenses exist in the first place. Why is it important for the – because it provides the jury important legal context as to why the per se category exists. And it goes on to explain it separates the concept of harm. Now, I also want to be clear about the record, though. Judge Chen – A per se violation is not an element of the offense in any way, right? Why is it necessary to establish that? Well, it was important to – Your Honor, it was important to provide the jury context as to the legal structure that they were applying. I mean, this is similar to – this is similar to a statutory purpose instruction that is often given in economic crimes. For example, in tax evasion, it's often explained to jurors why it's important for honesty, why the government FISC requires honesty. In perjury cases, it's often instructed to juries why the – why oaths are important in the criminal justice system and the importance of punishing people who do not fulfill their oaths. So this was the – right along with those types of instructions. And what the government was arguing, again, was the context of this offense. The fleeting remark to Mr. Lyshevsky was exactly the kind of statement this court has held, is not to be taken in its most damaging light, nor is it to be assumed the jury took it in that sense. That's what this court has held. That's what the Supreme Court has held. Mr. Lyshevsky did not argue – Just to interrupt, just for a second, though. I mean, taking your point that you wanted to explain the per se, this particular instruction goes on to talk about lack of any redeeming value. And that's – you know, that's getting close to making an evidentiary finding. And it certainly would be – if I were sitting at the counsel table, I would think it was prejudicial. Well, Your Honor – I mean, you can say there's a per se violation and instruct the jury without going into saying that there's absolutely no redeeming value, implying that that's what happened here. But, Your Honor, I would note that there was no objection from counsel table to this particular language in the instruction. And there was no objection during the government's closing argument. In fact, Lyshevsky in his very first proposed jury instructions included the same language, harmful effect and lack of any redeeming virtue. And that's at docket entry 256 at page 23. So this language was there from the very beginning. He knew about it. He never raised a specific objection to this language. But to Your Honor's point, that is not a statement of fact. That is a principle of law and economics. And it's derived directly from decades of Supreme Court precedent. Yeah, I mean, this one I think has some analogies to the Pinkerton instruction, which Mr. Klein didn't have an opportunity to raise. But, I mean, another instruction that is sort of accurate on its face is a statement of law. But how many accurate statements of law can be put in front of the jury before it starts to transform the instructions in some way that the defendant may find unreasonable? Well, the defendant may find it unreasonable, but there was no misstatement of law. And Mr. Lyshevsky doesn't dispute that. The Pinkerton instruction, as Mr. Lyshevsky calls it, was not in fact a Pinkerton instruction at all. The language that was originally proposed by the government is taken directly from this court's, or not directly, but it is strikingly similar to the language in this court's model instruction 8.20. And what it explains is that once you join the conspiracy, you are just as culpable as an originator, regardless of when you do. I agree. That's true. But why was that instruction necessary here? It was necessary because the jury could have found, for example, that Lyshevsky joined the conspiracy later on. That Cameron may have brokered the price competition truce by himself at the outset, and Lyshevsky may have joined later on during the list price increases or the net pricing guidance fixing. So this instruction was necessary to explain to the jury that he's responsible as soon as he joins the entire conspiracy. Now, what Lyshevsky did was he was the one that added the language about responsibility for the acts of others. That language was not in the government's initial proposed jury instructions. And we objected to that language, and Lyshevsky defended it. He argues at 13 S.E.R. 31.18 that the language in this jury instruction, without equivocation, is consistent with Ninth Circuit precedent. And I'm aware of no case where there are so many legally correct jury instructions that there's somehow an unfairness to the defendant. There are portions of this jury instruction that are repetitive and favorable to Lyshevsky. The government's burden of proof is mentioned 11 times, 11 instructions out of 40. At E.R. 29 and E.R. 30, there are two identical sentences that explain a principle that is favorable to the defendant. And what it says is that if you advance the purpose of the conspiracy without knowledge of the conspiracy, you're not a member of the conspiracy. That is repeated verbatim in those two instructions. Judge Chen gave that instruction. You know, that language was included, and it was favorable to the defendant. So this is the kind of – it's important for jury instructions to not only provide legal context and background, but to explain to the jury repeatedly important legal concepts and reinforce those concepts so that they understand them when they go back to deliberate. And that's all the instructions here were doing. Lyshevsky makes it seem as if the jury instructions in a case have to be just a bare recital of the elements of the offense. But that's simply not the case, and this court never held that. What was going on here was every one of these instructions was presented by the government as an effort that was based on the evidence. Judge Chen was remarkably conscientious and careful in listening to the concerns of counsel on both sides and Mr. Lyshevsky's concerns. And I would note Mr. Lyshevsky, from the very beginning, was using agreement or understanding in his own proposed jury instructions. This is 15 S.E.R. 3443. That is before Judge Chen said anything about the ABA model instructions. Judge Chen did not exclude further objections based on the ABA model. What he said was he was going to adhere to that, but he would consider other rulings. And the jury instruction Lyshevsky proposed in August of 2019, 15 S.E.R. 3443, was later adopted and incorporated, the E.R. 22. It's the exact same language that was incorporated and moved there. It was modified somewhat, but it's the same basic principle, and that is part of Lyshevsky's challenge in this case. Part of what he's challenging is the language of E.R. 22, which actually was two paragraphs devoted to explaining to the jury the parallel pricing, sharing pricing information, copying pricing lists, copying price information, that none of that would prove conspiracy. And those instructions were given at Lyshevsky's request. But to go back to the individual liability instruction, or I'm sorry, the knowingly joined instruction, the instruction was important so that the jury understood the interconnected nature of the conspiracy and the interconnected nature of conspiracies generally. And Lyshevsky was arguing part of his theory of the case was that he was not involved because he did not have direct contact with these other individuals at Sarkis and Chippenham C. He denies that that was part of his case, but we cited, to the fortune of the record, he brought that out on direct. He also argued it during closing, and he makes the same point on page 22 of his opening brief, where he says that he knows that Hodge testified that he had no direct contact with Lyshevsky. But three out of the four co-conspirators were direct eyewitnesses to Lyshevsky's orchestration and involvement in this conspiracy. The knowingly joined instruction was important so that the jury understood that that was not a defense. And what it did was it provided the jury some additional context as to how co-conspirators are sort of partners in crime. It reinforced the initial conspiracy instruction. I'd like to also discuss the – there was the issue about individual liability instruction, and it's important to note that Mr. Klein acknowledges that the same objection was not raised below. The objection they're raising now about aiding and abetting liability was not raised below. What he argued below was it was unnecessary and that it was not supported by the evidence, but that's a different ground to the objection. And Rule 30D requires the same specific ground to the objection be raised below that was raised on appeal. Additionally, the statutory basis for this instruction, as the Supreme Court held it wise, is the text of the Sherman Act itself. We quoted the text of the Sherman Act at page 30 of our opening brief. And what it says is that every person who is engaged in – every person who engages in any unlawful combination or conspiracy is guilty. And what the Supreme Court held and wise was that that covers every corporate officer with a responsible share in the transaction. Can you respond to Mr. Klein on the Brown case, our Brown case? Yes, Your Honor. The first point he makes, I'm not quite sure what he's referring to because the language of the last – the same principle is conveyed in this instruction, not in the same words. But the same principle is conveyed that this is a manner in which they would – the language is not used, but the idea is the same. And I would also point out that the indirectly helping a subordinate perpetrate the crime, that is not sufficient by itself. There was – he had to – we had to prove that he knew that there was a conspiracy, that he knew the subordinate was involved in the conspiracy, and that he knowingly authorized, ordered, or consented the subordinate's participation for the purpose of advancing the object of the conspiracy. It wasn't enough that he sort of may have given an indirect thumbs up to somebody, and that was enough without knowing the conspiracy existed. And the language of the instruction is not aiding and abetting. And the key point here is the last sentence of the opening paragraph. It says that a person is responsible for their own conduct or conduct that they cause to be performed on their behalf. And so there's a causal element and a representational element. That is not true in aiding and abetting liability. The principle is not necessarily acting on behalf of the accomplice. This was conspiracy liability. What Brown held was that this was a theory of conspiracy liability. That refutes any notion Leshefsky raises about some similarity to aiding and abetting liability. Because this follows from the text of the Sherman Act itself, because it's a theory of conspiracy liability, that this court has recognized for 30 years, there is no aiding and abetting objection that can be raised, and certainly not one in this case where it was never raised below. The judge should have never had a chance to rule on Brown for the objection being aiding and abetting liability. It was never asserted. And additionally, I would note, Leshefsky not only proposes indirectly or directly language, he cited this court's decision in Brown below as support for it. And not just cited Brown, but cited footnote 4, and this is at 4 ER 655 to 56. We cited it in our brief, and Leshefsky does not address it. And the same thing is true of the Pinkerton. Could you address the hypothetical by Mr. Klein about the two oil, I guess, gas station owners, you know, the price of oil is going up. So, you know, everything is going up, so I got to raise prices. And the other guy says, yeah, I need to raise prices too. That does seem to fit under a mutual understanding to stabilize prices, that that doesn't seem like it would be a conspiracy. Well, if I understand Your Honor's hypothetical correctly, are you saying that they spoke to one another and said, I got to raise prices. Yeah, I also got to raise prices. Right. That could give rise to an inference. Yes, that could very well be a mutual understanding. That would be a question of fact of the jury. But Leshefsky's point, but the concern, yes. But it's not necessarily a conspiracy to fix prices. You would agree with that? No, no, that could very easily lead to it. It wouldn't necessarily be a conspiracy to fix prices. Right, that's my point. It definitely could lead to inference of it, but it does not necessarily. And so that fits into the definition of a mutual understanding to stabilize prices. Your Honor, the concern Leshefsky's raising is a concern about similarity or parallel prices. This instruction expressly excludes that. Okay. The fact that there's – if there's communication between them and what they're saying is, yeah, you know, I think, you know, I should probably raise prices too because oil prices are going up. That could very easily give rise to a – but that would not be – that's not something that falls within this instruction because it requires a mutual understanding. They have to knowingly work together to accomplish a common unlawful purpose. So you're getting that from Instruction 18 rather than the 19? Yes, Your Honor. I'm getting the knowingly work together to accomplish a common purpose. That's from ER-20. It's an instruction – it's a conspiracy instruction. Yes, and all throughout the instruction is requiring concerted action. The central organizing principle of Section 1 of the Sherman Act is concerted action, not independent action and not passive belief. What Leshefsky's pointing to is he's saying that this could just be passive belief. That's not the case under these instructions. He's also suggesting, well, it could just be parallel pricing. That language was included in the instruction at his request, expressly excluding similarity or parallel pricing as being a basis for conspiracy. I would also note, however, that when it comes to the agreement, the existence of the agreement or the conspiracy, Leshefsky's – the evidence on that point was so overwhelming, Leshefsky's counsel conceded a closing argument at 14 S.E.R. 3301 that the conspirators, the co-conspirators were caught red-handed. They weren't even being careful. He says again at 3325 the co-conspirators were – I can't say what they were doing wasn't criminal or wasn't wrongful. The only argument they made was that they simply didn't join the conspiracy. And so – but that – and that issue too is decided – That is my question. What is the best – if we were to agree with Mr. Klein, what is the best evidence to show that it's all harmless? The best evidence? Yeah. Well, our primary submission is this was review of plain error and the burdens on Leshefsky to prove harmlessness. But the best evidence for showing harmlessness would be, I think, the testimony of the co-conspirators. And not only that, but Leshefsky's own testimony on the witness stand, which we began our closing argument by emphasizing Leshefsky's own testimony. What he said was he was simply trying to achieve peace with his competitors, by which he meant everyone would step back and accept the market shares they historically had and stop attacking based on price. And then when he was questioned about that on cross-examination, he initially tried to deny recalling that he made the statement, and eventually had to concede that he had. Now, what that is is essentially a confession of guilt that he was involved in a price-fixing conspiracy. He wanted his competitors to step back. Additionally, he admittedly on direct examination admitted that he met with Chu and Chan. They discussed pricing strategy. And when Chan assured him the chicken of the sea would not promote aggressively, he thanked Chan. He admittedly thanked him and then sent him a follow-up email telling him, I appreciate your comments the other day. And that's at 5 ER 847. He tells him, I appreciate your comments the other day, referring back to the assurances he gave him about not deviating from the conspiracy. And then he says, would it be nice to see your prices, you know, reflect, essentially get, you know, see that reflected in the market, which means basically get your prices up and behave in accordance with the conspiracy. And he was sending Chan repeated emails. It's notable that the evidence Leshefsky's counsel pointed to during closing argument about being caught red-handed applies equally to him. He says the co-conspirators were caught red-handed because they were emailing competitors and calling competitors and talking about prices. But Leshefsky admittedly did the exact same thing. He did it repeatedly with Chu and Chan. He was constantly emailing and telling me to get his prices up. They met in person and they discussed chicken of the sea's pricing strategy. They did it twice. Leshefsky couldn't deny the second time because he knew he told Cameron about the conversation that night and Cameron saw the whole thing. And he was blind copying Cameron on at least one of the emails he sent to Chu and Chan. There would have been no reason for him to blind copy his subordinate and co-conspirator if there wasn't some sort of understanding between the two of them that there was a conspiracy. What Leshefsky was trying to convey to Cameron was that, yes, I'm also enforcing this conspiracy. Now, there were a few other issues raised earlier, and I want to make sure that I respond to your honest concerns as well about the other evidence in the record. The other important point to make about the evidence is that the documents and data that Leshefsky points to corroborate the testimony of the co-conspirators because what they testified to was that this was an imperfect conspiracy. It was plagued by cheating, and it was never intended to eliminate all competition in the market. They knew they couldn't get their competitors to simply roll over and stop competing. So what they did was they agreed to suppress and limit price competition, and they did so by concluding on the timing and amount of the list price increases. Leshefsky's counsel points to the fact that there was parallel pricing before, during, and after the conspiracy. But before the conspiracy, there were several-month gaps between the list price increases of competitors, three months, nine months, ten months. But during the conspiracy, the list price increases occurred within days of one another or at most weeks of one another. The net pricing information correlated with fish costs. It also correlated precisely with the net pricing guidance that was fixed by the conspirators. And with the conspirators, much of the evidence Leshefsky points to, some of it is pre-conspiracy prices or it's, you know, limited-time sales that are offered in Ash Wednesday sale at Kroger. Other documentary evidence Leshefsky points to corroborates the existence of the conspiracy, but they're talking about, you know, code words about, you know, competitors showing rationality in their pricing. And I see that my time has expired, but I really want to emphasize for the court, the jury instructions in this case were legally correct, and the evidentiary rules were correct, and the judgment should be affirmed. Thank you. Thank you, counsel. We'll hear rebuttal. Thank you, Your Honor. I'd like to make three quick points in my three minutes. First, on the per se instruction. The instruction itself was unnecessary because the jury had no need to know anything about the per se rule. But even if it was okay to give the part of the per se instruction that told the jury it didn't have to consider reasonableness and that this was deemed unreasonable, there was no need whatsoever to talk about the harm from these agreements and the lack of any redeeming virtue. And it was particularly wrong to do that after barring Mr. Leshefsky from proving the opposite. And the government's closing argument simply highlighted the prejudice from that combination of errors. Second, on the Pinkerton instruction, which I didn't have time to talk about in my first argument, it was completely unnecessary and bound to be confusing to the jury. And the reason is Pinkerton is a theory under which a conspirator is liable for the acts of other conspirators. And typically, it's liable for substantive crimes of other conspirators. Here, the only element that was in question was whether Mr. Leshefsky joined the conspiracy. Once the jury found that he joined the conspiracy, it was totally irrelevant whether he was responsible for the acts of other conspirators. The only thing that mattered, which is why all these instructions are so critical, is whether Mr. Leshefsky joined this conspiracy. I think opposing counsel talked about the preservation on that issue. I don't want to spend my remaining 80 seconds talking about that, but I would refer the court to pages 17 and 18 of our reply brief. Finally, on this question of harmless error, we have gone into the facts in such detail in our opening brief, which is something as a criminal lawyer on appeal, I rarely do. Usually, it's the government that wants to stress the facts, but I did that here. And I did it because the facts are, I would say, favorable to the defense. Now, the government had its cooperators, and they performed as they were supposed to perform. But if you look at the objective evidence, you look at the contemporaneous documents, and I urge the court to read that section of our opening brief. If you look at those documents, there was fierce competition. There's not a word about cooperation or the competition rolling over or anything. It is fierce competition from the beginning of this alleged conspiracy to the end. If you look at the economic data, which, again, is objective data presented by Dr. Levinson, it's the same story. There is not a hint of an illegal price-fixing agreement here. The economic data is powerful evidence for the defense. This is not a sufficiency case. If it were a sufficiency case, the cooperators would carry the day, even if they were totally unbelievable. May I have a couple more seconds, Your Honor? Certainly, yeah. Thank you. Even if they were totally unbelievable. Harmless error looks at the whole record, and it recognizes that jurors can disbelieve cooperators, and it does not draw all inferences in favor of the government. We're talking about that type of analysis here and not a sufficiency analysis. Thank you, Your Honor. Thank you, counsel. Thank you both for your arguments today and your briefs. It was very helpful to the court. The case will be submitted for decision and will be in recess for the morning.
judges: Thomas, Bress, Bumatay